UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAWASHIA FARMER,

                                        Plaintiff,

              -v-

SHAKE SHACK ENTERPRISES, LLC, SHAKE
SHACK 152 E 86 LLC, and DAMON CORDOVA,
*individually*,

                                        Defendants.

19 Civ. 9425 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This case involves alleged violations by an employer of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, New York State Executive Law § 296 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code § 8-502(a) *et seq.* ("NYCHRL"). Plaintiff Dawashia Farmer asserts that she was employed by defendants Shake Shack Enterprises, LLC, and Shake Shack 152 E 86 LLC (together, the "Shake Shack Defendants"), beginning in November 2018. In late November of that year, Farmer informed her manager, defendant Damon Cordova, that she was pregnant. Over the next month, Farmer alleges that she was discriminated against based on her pregnancy and race, resulting in her termination around January 5, 2019. Farmer brings federal and state-law claims of race- and sex-based discrimination, retaliation, and hostile work environment, along with state-law claims of aiding and abetting discrimination and retaliation.

Before the Court is defendants' motion to dismiss Farmer's Amended Complaint ("AC"). For the following reasons, the Court grants that motion in part and denies it in part. Specifically,

the Court sustains Farmer's sex discrimination and retaliation claims (and associated aiding and

abetting claims against Cordova), but otherwise grants the motion to dismiss.

## I.      Background

### A.      Factual Background[1]

#### 1.      The Parties

Farmer is an African American woman who resides in Bronx County, New York.  AC

¶¶ 8, 32.  She was employed by the Shake Shack Defendants as a "team member."  *Id.* ¶ 20.

Shake Shack Enterprises, LLC ("Shake Shack Enterprises"), is a domestic limited

liability company with its principal place of business located at 24 Union Square East, New

York, New York.  *Id.* ¶ 9.  Shake Shack 152 E 86 LLC ("Shake Shack UES") is a domestic

limited liability company with its principal place of business also located at 24 Union Square

East, New York, New York, on the same floor as Shake Shack Enterprises.  *Id.* ¶ 11.  The AC

alleges that the Shake Shack Defendants are joint employers, sharing "commonalities of hiring,

firing, discipline, pay, insurance, records, and supervision."  *Id.* ¶ 14.  The two have the same

chief executive officer, general counsel, and registered agent.  *Id.* ¶¶ 17–19.  Together, the Shake

Shack Defendants own and operate a restaurant location at 154/156 E 86th Street, New York,

New York (the "Restaurant"), on the Upper East Side of Manhattan.  *See id.* ¶ 13.

Cordova, a white male, was and is employed by the Shake Shack Defendants as a

"general manager."  *Id.* ¶¶ 21, 23.  Cordova interviewed and hired Farmer.  *Id.* ¶ 25.  He was

---

[1] The facts are drawn primarily from the Amended Complaint.  Dkt. 19 ("AC").  For the purpose
of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to
be true and draws all reasonable inferences in favor of plaintiff.  *See Koch v. Christie's Int'l
PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Farmer's supervisor and had the power to "hire, fire or affect the terms and conditions of [her] employment." *Id.* ¶ 22.

### 2.     Farmer's Employment and Defendants' Alleged Discrimination

In early November 2018, Cordova interviewed Farmer and hired her for the role of "team member" at the Restaurant. *Id.* ¶¶ 25, 28. The AC alleges that, on the basis of her hiring, Farmer was qualified for her job. *See id.* ¶ 26. The Shake Shack Defendants initially paid Farmer at a rate of $13.50 an hour. *Id.* ¶ 28. Around the start of 2019, they raised her pay to $15 per hour. *Id.* ¶ 29. She worked approximately 40 hours per week, with an expected annual income of $31,200. *Id.* ¶¶ 30–31.

In late November 2018, Farmer informed Cordova, her shift manager, and other team members that she was pregnant. *See id.* ¶¶ 33–35. Some responded positively. *Id.* ¶¶ 33–34. Cordova, along with a regional manager, reprimanded Farmer for not disclosing her pregnancy earlier, as Farmer was three months pregnant at the time; he said that he needed to know about such things so he could "take care of [her]." *See id.* ¶¶ 36–38 (alteration in original). Cordova, who had noticed Farmer acting sluggishly, "excoriate[d]" her for moving slowly and asked if the pregnancy would interfere with her work. *Id.* ¶¶ 35, 38. Farmer was "humiliated, threatened and fear[ed] for her job," but replied that the pregnancy would not interfere with her ability to work, and assured Cordova that she would inform him if anything changed. *See id.* ¶ 39. The regional manager suggested that, if Farmer's performance was lacking, "it would not be best for business." *Id.* ¶ 40.

After this meeting, Cordova gave Farmer paperwork to claim a short-term disability, and suggested she complete the forms. *Id.* ¶¶ 42–43. On approximately December 17, 2018, after a follow-up from Cordova, Farmer submitted the disability claim. *Id.* ¶¶ 44, 48.

In or around late November 2018, a different manager, Leon, told Farmer that management did not believe that she was pregnant, and that she should speak to Cordova about it. *Id.* ¶ 45. Soon after, however, Leon "reversed course" and told Farmer that she did not need to talk with Cordova. *Id.* ¶ 47.

In mid-December 2018, Farmer complained several times to two managers—Jeffrey #1 and Jeffrey #2—that "she was overheated in the back of the house," and asked if "she could work in the front of the house." *Id.* ¶ 49. Jeffrey #1 accommodated Farmer by moving her to the front, but Jeffrey #2 continually commented that Farmer was needed in the back. *Id.* ¶¶ 50–51. Farmer then complained to Leon that she felt Jeffrey #2 was treating her differently due to her pregnancy. *Id.* ¶ 52. The AC alleges that the negative treatment increased after that complaint. *Id.* ¶ 53.

On approximately January 1, 2019, Farmer was brought into Cordova's office and told that her performance had been declining, due to her inability to lift and restock her workstation. *Id.* ¶ 54. Farmer noted that she was unable to lift because of her pregnancy, but Cordova stated that he did not believe Farmer was pregnant and that she needed to bring in paperwork to confirm her pregnancy. *Id.* ¶¶ 56–57. When Farmer told Cordova that she could provide a doctor's note after a medical appointment on January 11, 2019, he responded that that would be too late: She had to bring in paperwork by the next day, January 2, 2019, or risk termination. *See id.* ¶¶ 58–59. On January 4, 2019, Farmer brought in documentation confirming her pregnancy. *Id.* ¶ 60.

On approximately January 5, 2019, Farmer asked her crew trainer if she could use the restroom because she was not feeling well; the crew trainer allowed her to do so. *Id.* ¶ 63. Cordova then called Farmer into his office and told Farmer, "in a very dismissive tone," that she

4

had not asked a manager whether she could use the restroom. *Id.* ¶¶ 64–67. Cordova then told Farmer that the letter confirming her pregnancy "did not count for anything" and—despite Farmer's assertions to the contrary—that she could not keep up with the work. *Id.* ¶¶ 67–70. Cordova then fired Farmer. *Id.* ¶ 70. The AC alleges that Farmer was fired because she was an African American pregnant woman. *See id.* ¶ 71.

Shortly before Farmer was fired, Cordova told employees that he had hired 15 people but only needed 10, so they "needed to do the math." *Id.* ¶ 72. Soon after, Cordova fired three more employees—two African American employees and one African American and Hispanic employee. *Id.* ¶¶ 72–73. A month later, Cordova accused Leon, the only African American manager at the Restaurant, of "shorting a register." *Id.* ¶ 78. Leon stopped working at the Restaurant soon thereafter. *Id.*

### B.  Procedural History

On October 11, 2019, Farmer filed her initial complaint. Dkt. 1. On December 10, 2019, defendants filed a motion to dismiss. Dkt. 13. The Court ordered Farmer either to amend her complaint or to oppose the motion by January 7, 2020. Dkt. 16. On January 7, 2020, Farmer filed the AC. Dkt. 19. On February 14, 2020, defendants filed a second motion to dismiss, Dkt. 20, along with a supporting memorandum of law, Dkt. 21 ("Def. Mem."). On February 28, 2020, Farmer filed an opposing memorandum. Dkt. 22 ("Pl. Mem."). On March 6, 2020, defendants filed a reply. Dkt. 23 ("Def. Reply").

## II.    Applicable Legal Principles

### A.    Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.   Discussion

The AC brings the following claims: (1) sex and gender discrimination under Title VII, the NYSHRL, and the NYCHRL; (2) race discrimination under Title VII, the NYSHRL, and the NYCHRL; (3) retaliation under Title VII, the NYSHRL, and the NYCHRL; (4) hostile work environment under Title VII and the NYSHRL; and (5) aiding and abetting discrimination and retaliation under the NYSHRL and the NYCHRL.

In moving to dismiss, defendants make a threshold argument: that the AC does not adequately plead that Farmer was an employee of the Shake Shack Defendants. They then challenge each of the AC's claims. The Court first addresses Farmer's employment, and then each claim.

### A.   Employment Relationship

Defendants argue that the AC inadequately pleads that Farmer was an employee of either Shake Shack Defendant. *See* Def. Mem. at 7–9; Def. Reply at 2. This argument is easily to one side. Construing the facts pled in Farmer's favor, as the Court must, the AC plausibly alleges

that Farmer was employed by Shake Shack Enterprises, and that it and Shake Shack UES

operated as joint employers.

To determine whether an individual is an employee for Title VII purposes, courts look to

"a non-exhaustive list of thirteen factors," first articulated in *Community for Creative*

*Non-Violence v. Reid*, 490 U.S. 730 (1989).  *See Knight v. State Univ. of N.Y. at Stony Brook*,

880 F.3d 636, 639, 641–42 (2d Cir. 2018).  Those factors are:

> the hiring party's right to control the manner and means by which the product is
> accomplished[;] . . . the skill required; the source of the instrumentalities and tools;
> the location of the work; the duration of the relationship between the parties;
> whether the hiring party has the right to assign additional projects to the hired party;
> the extent of the hired party's discretion over when and how long to work; the
> method of payment; the hired party's role in hiring and paying assistants; whether
> the work is part of the regular business of the hiring party; whether the hiring party
> is in business; the provision of employee benefits; and the tax treatment of the hired
> party.

*Id*. at 639 (quoting *Reid*, 490 U.S. at 751–52).  Courts have also imputed an "antecedent

requirement that [an] individual receive renumeration."  *Id.* at 642 (citing *O'Connor v. Davis*,

126 F.3d 112, 115–16 (2d Cir. 1997)).  The same test has been applied under both the NYSHRL

and the NYCHRL.  *See, e.g.*, *Salomon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226–27

(2d Cir. 2008), *as amended* (Apr. 22, 2008) (NYSHRL); *Cosgriff v. Valdese Weavers LLC*,

No. 09 Civ. 5234 (KMW), 2012 WL 1071497, at *4–5 (S.D.N.Y. Mar. 30, 2012) (NYCHRL).

Here, the AC alleges that Farmer was hired by Cordova, an employee of the Shake Shack

Defendants, in November 2018, AC ¶¶ 21, 25; that she worked for the Shake Shack Defendants

as a "team member," earning an hourly wage, *id.* ¶ 28; that her hours of employment were

regular and "approximately forty (40) hours per week," *id.* ¶ 30; that she was paid by Shake

Shack Enterprises, *id.* ¶ 15; that she worked at the Upper East Side Shake Shack location, owned

by the Shake Shack Defendants, *see id.* ¶¶ 13, 28; that both Shake Shack Enterprises and Shake

Shack UES share the same principal place of business, general counsel, registered agent, and

chief executive officer, *id.* ¶¶ 9, 11, 17–19; and that the entities jointly controlled her "hiring, firing, discipline, pay, insurance, records, and supervision," *id.* ¶ 14.

Taken together, these allegations adequately allege Farmer's employee status under the multi-factor test above. The AC alleges Farmer worked at the Upper East Side Shake Shack, a location which it alleges was owned and operated by the Shake Shack Defendants, with a liquor license owned by Shake Shack UES. *See id.* ¶¶ 13, 16, 28. As such, drawing all inferences in Farmer's favor, the Shake Shack Defendants were the "source of the instrumentalities and tools[,] [and] the location of" Farmer's work, and were "in business." *Knight*, 880 F.3d at 639 (citation omitted). The AC also plausibly alleges that she performed work that was "part of the regular business of" the Shake Shack Defendants, *id.* (citation omitted), as an employee working in both the "front of the house" and "back of the house," AC ¶ 49. In addition, the AC alleges that Farmer was paid a regular hourly wage and worked a set schedule, *see id.* ¶¶ 29–30, suggesting that, unlike an independent contractor, she had little "discretion over when and how long to work" or "the method of payment," *Knight*, 880 F.3d at 639 (citation omitted). Cordova, her direct manager, was allegedly an employee of the Shake Shack Defendants, AC ¶¶ 21–22, and both hired and fired Farmer, *id.* ¶¶ 25, 70, and spoke to her about her performance and her pregnancy, *see, e.g.*, *id.* ¶¶ 37–38, further indicating that Farmer was an employee. Finally, the AC alleges that the Shake Shack Defendants controlled the "manner and means" of her work (through supervision and hiring policies) and the duration of her employment (through disciplinary and firing policies), cabined her discretion as to when and how long to work (through all of the above and setting her hours), and set her employee benefits (through her insurance and record keeping). *See* AC ¶¶ 14–15; *Knight*, 880 F.3d at 639 (citation omitted).

These allegations more than suffice to allege that Farmer was, at a minimum, an employee of Shake Shack Enterprises—the entity she alleges paid her.  *See* AC ¶ 15.

The AC also adequately pleads facts indicating that Shake Shack Enterprises and Shake Shack UES operated as Farmer's joint employers.  Under the joint employer doctrine, "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer."  *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005); *see also Knight*, 880 F.3d at 642.  The joint employer inquiry is "functional[] . . . and factual."  *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 313 (S.D.N.Y. 2014) (citation and internal quotation marks omitted) (alteration in original).  Befitting this approach, the Second Circuit has not enumerated "a test for what constitutes joint employment in the context of Title VII[.]"  *Arculeo*, 425 F.3d at 199 n.7.  Instead, it has held that "an essential element" of such a finding requires "sufficient evidence of immediate control over the employees."  *Serv. Emps. Int'l Union, Local 32BJ v. NLRB*, 647 F.3d 435, 442 (2d Cir. 2011) (alteration omitted) (quoting *Clinton's Ditch Co-op Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985)).  "[F]actors courts have used to examine whether an entity constitutes a joint employer of an individual include 'commonality of hiring, firing, discipline, pay, insurance, records, and supervision.'"  *Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30 (2d Cir. 2015) (citation omitted); *accord Serv. Emps. Int'l Union*, 647 F.3d at 443.

Here, the AC alleges each of these factors.  Although at points the AC does so in a conclusory fashion, *see, e.g.*, AC ¶ 14, the AC's specific factual allegations adequately plead the

functional symbiosis of the two defendants, which allegedly shared management and a principal place of business, *id.* ¶¶ 9, 11, 17–19, shared ownership and operation of the Restaurant, *id.* ¶ 13, and jointly employed not only Farmer but Cordova, who hired, fired and supervised her, *id.* ¶¶ 21, 25, 28, 70.  Measured by the standards applicable at the pleading stage, Farmer adequately alleges that the entity defendants were her joint employers for purposes of all claims.

### B.    Sex Discrimination

The AC alleges that defendants discriminated against Farmer on the basis of her sex, in violation of Title VII, the NYSHRL, and the NYCHRL—specifically, by discriminating against Farmer because she was pregnant.

#### 1.    Title VII and the NYSHRL Claims

##### a.    *Applicable Legal Principles*

Under Title VII, it is unlawful for an employer to "to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1). "The Pregnancy Discrimination Act [('PDA')] makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy."  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (quoting *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1343 (2015)).  Specifically, the PDA amended Title VII to clarify that

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work[.]

*Xiang v. Eagle Enters., LLC*, No. 19 Civ. 1752 (PAE), 2020 WL 248941, at *4 (S.D.N.Y. Jan. 16, 2020) (quoting 42 U.S.C. § 2000e(k)).

Similarly, the NYSHRL states that it is "an unlawful discriminatory practice" for an employer, based on an individual's gender or sex, "to discharge from employment . . . or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a).  Moreover, § 296 of the NYSHRL provides that it "shall be an unlawful discriminatory practice for an employer . . .  to refuse to provide reasonable accommodations to the known disabilities, or pregnancy-related conditions, of an employee[.]"  *Id.* § 296(3)(a).

Claims under both Title VII and the NYSHRL, including sex and pregnancy discrimination, are generally treated as "analytically identical," and addressed together.  *Lenzi*, 944 F.3d at 107 n.7 (citation omitted); *see also EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 832 (S.D.N.Y. 2013) (citing *Pucino v. Verizon Wireless Commc'ns, Inc.,* 618 F.3d 112, 117 n.2 (2d Cir. 2010)).  Both are governed by the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973).  *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016).  Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a *prima facie* case of employment discrimination by showing that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."[2]  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (alterations omitted) (quoting *Walsh*, 828 F.3d at

---

[2] The Second Circuit has stated that the *prima facie* case for pregnancy discrimination, in the termination context, includes the following elements: that the plaintiff (1) is a member of a protected class; (2) satisfactorily performed the duties required by her position; (3) was discharged; and (4) had her position filled by a non-pregnant employee, or shows that the discharge occurred in circumstances giving rise to an inference of discrimination.  *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995).

75).  If the plaintiff meets that "minimal" burden, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993), "a temporary 'presumption' of discriminatory motivation" arises, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015)).  The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct.  *Littlejohn*, 795 F.3d at 307.  Upon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination.  *See id.* at 307–08.

At the motion to dismiss stage, however, a plaintiff "is not required to plead a *prima facie* case under *McDonnell Douglas* . . . to defeat a motion to dismiss." *Vega*, 801 F.3d at 84; *see also Forkin v. Local 804 Union (IBT)*, 394 F. Supp. 3d 287, 307 (E.D.N.Y. 2019) ("At the pleading stage, . . . a plaintiff need not prove discrimination or even allege facts establishing every element of the *McDonnell Douglas prima facie* case.").  Instead, "[t]he facts alleged must give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Littlejohn*, 795 F.3d at 311.  For employment discrimination claims under Title VII or the NYSHRL, a plaintiff must "plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega*, 801 F.3d at 87.  A plaintiff may do this by "alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.*  In short, the complaint must plead facts that provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311.

### b.    Application

Farmer undisputedly satisfies the first and third elements of a *prima facie* case:  She is a member of a protected class, as a pregnant woman, AC ¶¶ 8, 32; and she suffered an adverse

employment action when she was terminated, *id.* ¶¶ 70–71; *see, e.g.*, *Feingold v. New York*, 366 F.3d 138, 152–53 (2d Cir. 2004). Defendants argue, however, that the AC does not adequately plead that she was qualified for the job from which she was terminated,[3] and that the circumstances surrounding her termination, as alleged, do not give rise to an inference of discrimination. Neither of these arguments is at all persuasive.

i.  Farmer's Qualifications

A "plaintiff need make only a minimal showing of qualification, that is, that 'she possesses the basic skills necessary for performance of [the] job.'" *Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 127 (E.D.N.Y. 2011) (internal quotation marks omitted) (alteration in original) (quoting *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)); *accord Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001), *as amended* (Apr. 20, 2001). The Second Circuit has repeatedly emphasized the light burden presented by this prong, which "must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory*, 243 F.3d at 696. "This principle is especially important in the context of a Rule 12(b)(6) motion, where what is at stake is whether the plaintiff gains the opportunity to demand such an explanation from the employer and to conduct discovery with respect to it[.]" *Id.* at 697.

Moreover, to meet her burden at the pleading stage, a plaintiff need not allege "perfect performance or even average performance," *id.* at 696 (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)), and an employer's dissatisfaction with the plaintiff's

---

[3] Defendants make the same arguments as to Farmer's alleged lack of qualifications in the context of the AC's race discrimination claim. The Court's discussion of them here equally applies to that claim. *See* Def. Mem. at 11–12.

performance is not tantamount to a lack of qualifications, *see Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 572 (S.D.N.Y. 2010).  "[E]specially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw."  *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001).

The AC alleges enough facts to plead Farmer's qualification for her job.  It alleges that defendants themselves so determined, by hiring her as a "team member," a role in which she served for approximately two months.  *See* AC ¶¶ 26, 28, 70.  The AC further alleges that Farmer received a raise during her short tenure.  *Id.* ¶ 29.  Defendants do not point to any pled or otherwise cognizable facts suggesting that Farmer was not qualified.  *See* Def. Mem. at 11–12; *see also Briggs*, 819 F. Supp. 2d at 128 (declining to dismiss complaint where defendants asserted, without factual support, that hired plaintiff was unqualified).

## ii.    Discriminatory Intent

Defendants next argue that the AC does not plead a causal connection between Farmer's pregnancy and her termination—*i.e.*, that Farmer was fired because she was pregnant, *see* Def. Mem. at 14—although defendants do not pursue this argument in their reply brief.  On this point, too, the AC's allegations clearly suffice.

The AC need only plead facts that provide "minimal support" for the inference that, in firing Farmer, defendants were, at least in part, motivated by her pregnancy.  *See Littlejohn*, 795 F.3d at 311.  Under Title VII and the NYSHRL, a plaintiff need not prove (or plead) that "the causal link between injury and wrong is so close that the injury would not have occurred but for the act."  *Lenzi*, 944 F.3d at 107 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013)).  "So-called but-for causation is not the test."  *Id.* (quoting *Nassar*, 570 U.S. at 343).  Instead, a plaintiff need only plead facts that plausibly allege that "the motive

14

to discriminate was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.* (emphasis in original) (quoting *Nassar*, 570 U.S. at 343)).

Plausible allegations to this effect may arise from a range of circumstances. These may include "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). In assessing the sequence of events, the "temporal proximity between the time she disclosed her pregnancy and her termination" is often an important consideration. *Lenzi*, 944 F.3d at 108; *see also, e.g.*, *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) ("[T]emporal proximity between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee likewise may . . . support . . . an inference of pregnancy discrimination[.]"); *Pellegrino v. County of Orange*, 313 F. Supp. 2d 303, 315 (S.D.N.Y. 2004) ("Evidence of temporal proximity between an employee's request for maternity leave and her termination is sufficient to establish an inference of discrimination."); *Briggs*, 819 F. Supp. 2d at 128 ("Temporal proximity between the plaintiff's termination and her pregnancy, childbirth, or related medical condition can raise an inference of discrimination.").

The facts alleged in the AC strongly support the necessary causal inference. First, defendants' comments about Farmer's work and the alleged progression of events support an inference that defendants acted with discriminatory intent in terminating Farmer. The AC alleges that defendants, sometimes overtly referring to Farmer's pregnancy, began to question

and harass her shortly after she told co-workers and managers that she was pregnant.  *See* AC ¶¶ 33–40.  In late November 2018, after hearing of the pregnancy, Cordova questioned Farmer's ability to continue working, *id* ¶¶ 38–39, and, in that same conversation, a regional manager stated that "it would not be best for business" if Farmer's performance were lacking, *id.* ¶ 40.  Cordova also explicitly reprimanded Farmer for not disclosing her pregnancy earlier, *id.* ¶¶ 37–38, and suggested that she file for short-term disability, *id.* ¶¶ 42–43.  The AC further alleges that, in mid-December 2018, other managers were displeased with Farmer's complaints about feeling overheated in the back of the house, *id* ¶¶ 51–53.  And, in early January 2019, Cordova questioned Farmer about her inability to lift and restock inventory and did not believe her when she said the difficulty was because of her pregnancy.  *Id.* ¶¶ 54–57.  Purportedly disbelieving that she was pregnant, Cordova demanded that Farmer, within one day, bring in paperwork to prove her pregnancy.  *See id.* ¶¶ 56–60.  And in the very conversation in which Farmer was fired, Cordova alluded again to the pregnancy, stating that he did not credit the documentation she had supplied of her pregnancy and that he believed she simply could not keep up with the physical requirements of the work.  *Id.* ¶¶ 67–70.

These events, as alleged, played out over a short period, such that the factor of temporal proximity supports Farmer's claim that the firing was motivated by discrimination.  Little over a month passed between late November 2018, when Farmer told Cordova and others that she was pregnant, *see* AC ¶¶ 33–35, and January 5, 2020, when Cordova fired Farmer, *see id.* ¶¶ 63–70.  This falls well within the two-month period in which courts frequently find a plausible inference of causation in discrimination cases.  *See, e.g.*, *Asmo*, 471 F.3d at 594 (termination within two months of disclosing pregnancy); *Lenzi*, 944 F.3d at 108 (termination less than a month after disclosing pregnancy); *Smith v. K & F Indus., Inc.*, 190 F. Supp. 2d 643, 649 (S.D.N.Y. 2002)

16

(poor performance review one month after disclosing pregnancy); *Flores v. Buy Buy Baby, Inc*., 118 F. Supp. 2d 425, 430–31 (S.D.N.Y. 2000) (termination approximately one month after disclosing pregnancy); *Klausner v. Indus. Risk Insurers, Inc.*, No. 98 Civ. 1267 (RPP), 1999 WL 476285, at *4 (S.D.N.Y. July 8, 1999) (same).

The assembled circumstances thus comfortably plead that defendants' termination of Farmer was motivated, at least in part, by her pregnancy. Farmer has therefore adequately pled a *prima facie* case of sex discrimination under Title VII and the NYSHRL.[4]

### 2. NYCHRL Claim

The NYCHRL uses the same framework as Title VII and the NYSHRL, but contains, as to some elements, more liberal pleading and proof standards. *See Deveaux v. Skechers USA, Inc.*, No. 19 Civ. 9734 (DLC), 2020 WL 1812741, at *5 (S.D.N.Y. Apr. 9, 2020) ("Claims brought under the NYCHRL are analyzed using the same framework as Title VII and NYSHRL claims, but 'must be viewed independently from and more liberally than their federal and state counterparts.'" (internal citation omitted) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009))). In particular, to establish a sex discrimination claim under the NYCHRL, "the plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

---

[4] The AC's pleading that Cordova (and other supervisors) acted with discriminatory intent also permits Farmer's sex discrimination claims against the Shake Shack Defendants to proceed, because this conduct as pled is properly imputed to the employer. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998) ("[E]mployer[s] [are] vicariously liable for actionable discrimination caused by a supervisor[.]"); *Menaker*, 935 F.3d at 37 n.81 ("[W]hen a supervisor fires an employee because of her sex . . . , the employer is liable because 'the injury could not have been inflicted absent the agency relation.'" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998))).

17

Because Farmer has adequately pled sex-discrimination claims under Title VII and the NYSHRL, her similar claim under the broader NYCHRL also necessarily survives. *See, e.g.*, *Levy v. Legal Aid Soc'y*, 408 F. Supp. 3d 209, 217 (E.D.N.Y. 2019). The Court therefore denies defendants' motion to dismiss Farmer's Title VII, NYSHRL, and NYCHRL sex discrimination claims.

### C.    Race Discrimination

The Court next addresses defendants' motion to dismiss the AC's claims of race discrimination under Title VII, the NYSHRL, and the NYCHRL.

#### 1.    Title VII and NYSHRL Claims

Farmer's Title VII and NYSHRL race discrimination claims are evaluated under the same *McDonnell Douglas* burden-shifting framework as her sex discrimination claims. *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). Here, too, to survive a motion to dismiss, the AC must plausibly allege that Farmer's race was a motivating factor for her termination. *See Vega*, 801 F.3d at 86–87.

For the reasons covered above, the AC adequately pleads that Farmer was qualified for her position at Shake Shack. The Court therefore rejects defendants' argument for dismissal on that basis. But the Court agrees with defendants that the AC's race discrimination claims are deficient for a different reason: They do not plausibly allege that she was fired, even in part, because of her race. To allege such discrimination, a complaint must plead facts "supporting a minimal inference that the employer's adverse action was motivated by the alleged discrimination." *Szewczyk v. Saakian*, 774 F. App'x 37, 38 (2d Cir. 2019) (citing *Littlejohn*, 795 F.3d at 311). There must be "factual context" to such a pleading; it may not be conclusory. *Twombly*, 550 U.S. at 549. Where non-conclusory allegations that tie the adverse action to racial

animus are lacking, the claim fails. *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 581 (S.D.N.Y. 2011).

As to race, the AC alleges only the following: that Farmer subjectively believes she was fired because she is African American, AC ¶ 71; that around the time of Farmer's discharge, Cordova fired two more African American employees and an African American and Hispanic employee, *id.* ¶¶ 72–73; and that Cordova, a month after her termination, accused the only African American manager of "shorting a register," *id.* ¶ 78. The AC does not allege that any defendant or supervisor made any racially insensitive or racially charged comments. Nor does it contain allegations as to the extent to which employees from other racial groups worked at the Restaurant or how the treatment of African American employees compared to that of white employees.

Even construing these allegations in the light most favorable to Farmer, they do not give rise to a plausible claim of termination on account of race. Farmer's subjective belief that her firing was motivated by her race is legally irrelevant. Further, that adverse actions were allegedly later taken against three African American employees based on circumstances unconnected to Farmer does not, without more, suggest that *her* termination was racially animated. Indeed, as pled, the AC's sparse allegations as to these other persons do not support that the actions against these other employees were animated by race, either. To the extent Farmer seeks to anchor her claim to the allegedly racist treatment of others in her workplace, more substantial allegations would be needed to "nudge[] [Farmer's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see also Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) (dismissing racial discrimination claim where complaint "lack[ed] any factual basis from which one could infer that any Caucasian employee

similarly situated to [African American plaintiff] was subject to differential treatment");
*Somerville v. William Beaumont Hosp.*, 373 F. Supp. 2d 702, 705 (E.D. Mich. 2005) (finding
plaintiff failed to establish *prima facie* case of race discrimination where he presented
"no evidence that a white employee . . . received different treatment for the same or similar
conduct").

In short, the AC does not plausibly connect Farmer's termination to racial animus.  *See*
*Powell v. Delta Airlines*, 145 F. Supp. 3d 189, 202 (E.D.N.Y. 2015) (dismissing claim for failure
to allege plausible inference of race discrimination where plaintiff alleged that he was only
African American working his shift, among 300 employees, and was fired).  While containing
substantial allegations bearing on her claim of pregnancy discrimination, the AC is devoid of
concrete allegations from which race discrimination by Cordova or any other supervisor could be
inferred.

Although not necessary to the Court's ruling—given the AC's barren allegations of race
discrimination—the facts pled, if anything, are in tension with its theory that, in firing Farmer,
Cordova was motivated by racial animus.  Just two months earlier, Cordova had hired Farmer,
and having interviewed her, was presumably aware of her race.  AC ¶ 25.  And where the same
actor hires and fires an employee in a short time period, courts may[5] draw an inference that the
firing was not with discriminatory intent.  *See Downey v. Adloox, Inc.*, 789 F. App'x 903, 907
(2d Cir. 2019); *see also, e.g.*, *Varno v. Canfield*, 664 F. App'x 63, 65 (2d Cir. 2016) ("[Plaintiff]
was hired and fired by the same supervisor, creating an inference against discriminatory intent

---

[5] This inference is "permissive, not mandatory."  *Memnon v. Clifford Chance US, LLP*,
667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009); *see also Ehrbar v. Forest Hills Hosp.*, 131 F. Supp.
3d 5, 24–25 (E.D.N.Y. 2015); *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286,
319 (E.D.N.Y. 2014).

absent . . . evidence that the supervisor made any discriminatory comments." (citing *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d. Cir. 2000))). That is because "when the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (citation omitted). Although the same-actor inference is mostly employed at summary judgment, *see Palmer v. Shchegol*, 406 F. Supp. 3d 224, 233 (E.D.N.Y. 2016), it applies here, and further undermines the AC's deficient pleadings of race discrimination. *See, e.g.*, *Carlton*, 202 F.3d at 137–38 (collecting cases finding same-actor inference applicable in connection with firings within two years of hiring).[6]

Accordingly, the Court dismisses the AC's Title VII and NYSHRL claims for failure to plausibly allege that Farmer's termination was a product of racial discrimination.

## 2.    NYCHRL Claim

The dismissal of the Title VII and NYSHRL claims does not automatically dispose of Farmer's NYCHRL claim because, as noted, "NYCHRL claims are to be reviewed more liberally than Title VII claims, and the provisions of the NYCHRL must be construed broadly in favor of plaintiffs alleging discrimination." *Levy*, 408 F. Supp. 3d at 217 (quoting *Johnson v. Andy Frain Servs., Inc.*, 638 F. App'x 68, 71 (2d Cir. 2016)); *see also Williams v. N.Y.C. Transit Auth*, 97 N.Y.S.3d 692, 695 (2d Dep't 2019). "Thus, where an adverse employment action is shown to be 'motivated by racial or ethnic animus, even in part, the defendant may be held

---

[6] The same-actor doctrine has no bearing on Farmer's pregnancy discrimination claims, because, on the facts pled, Cordova was unaware at the time he hired Farmer that she was pregnant. *See Tang v. Glocap Search LLC*, No. 14 Civ. 1108 (JMF), 2015 WL 1344788, at *4 (S.D.N.Y. Mar. 24, 2015) (same-actor inference did not apply where plaintiff was not pregnant at time of hiring or promotion).

liable' under the NYCHRL." *Williams*, 97 N.Y.S.3d at 695–96 (quoting *Singh v. Covenant Aviation Sec., LLC*, 16 N.Y.S.3d 611, 616 (2d Dep't 2015)).  That said, although the NYCHRL is broad, "a plaintiff's 'mere subjective belief that he was discriminated against because of his race does not sustain a race discrimination claim.'" *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 309 (E.D.N.Y. 2014) (citation omitted), *aff'd*, 594 F. App'x 29 (2d Cir. 2015).

Here, notwithstanding the NYCHRL's broader reach, the AC's race discrimination claim based on that statute falls well short of stating a claim.  Farmer's subjective belief that she was a victim of race discrimination, *see* AC ¶ 71, and the fact of adverse employment actions against several other African American employees, *id.* ¶¶ 72–73, 78, do not, without more, permit the required inference that Farmer's termination was racially motivated.  Even measured against the NYCHRL's standard, that claim is impermissibly speculative.

Accordingly, the Court dismisses all of Farmer's race discrimination claims.

### D.     Retaliation

The AC also brings claims of retaliation under the same three statutes.

#### 1.     Title VII and NYSHRL Claims

##### a.     *Applicable Legal Principles*

Title VII forbids an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee because she "has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(7).

The same standards govern retaliation claims under the two statutes.  Such claims are analyzed using the *McDonnell Douglas* burden-shifting framework.  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  To demonstrate a *prima facie* case of retaliation, a plaintiff must establish: "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  The plaintiff's burden of proof at the *prima facie* stage is "*de minimis.*"  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  If the initial burden is met, "a 'presumption of retaliation'" arises, which the employer "may rebut by 'articulating a legitimate, non-retaliatory reason for the adverse employment action.'"  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (brackets omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  If the employer provides such a reason, "the presumption of retaliation dissipates," and the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of the challenged employment action."  *Id.* (citation omitted).

As with discrimination claims, at the motion to dismiss stage, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation."  *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Littlejohn*, 795 F.3d at 316).  For a retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice."  *Id.* (quoting *Vega*, 801 F.3d at 90).

> b.      *Application*

Farmer's termination was undisputedly an adverse employment action.  Defendants argue

that the AC fails to adequately plead the other three prongs of the *prima facie* case: (1) Farmer's

engagement in a protected activity, (2) defendants' knowledge of that activity, and (3) a causal

connection between Farmer's protected activity and her firing.  *See* Def. Mem. at 15–16; Def.

Reply at 7–8.  The Court finds that the AC plausibly pleads these matters, measured against the

"reduced" showing applicable at the motion to dismiss stage.  *Littlejohn*, 795 F.3d at 316.

> i.      Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily

prohibited discrimination."  *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236

(2d Cir. 2012) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  The scope

of such activity is broad:  "When an employee communicates to her employer a belief that the

employer has engaged in . . . a form of employment discrimination, that communication *virtually*

*always* constitutes the employee's opposition to the activity."  *Littlejohn*, 795 F.3d at 317

(alteration and second emphasis omitted) (quoting *Crawford v. Metro. Gov't of Nashville &*

*Davidson Cty.*, 555 U.S. 271, 276 (2009)).  Protected activity may include both formal and

informal complaints, including complaints to management.  *See id.*; *see also Tang v. Glocap*

*Search LLC*, No. 14 Civ. 1108 (JMF), 2015 WL 5472929, at *2 (S.D.N.Y. Sept. 16, 2015) ("There

is no dispute that an employee's complaint about pregnancy discrimination—whether formal or

informal—can constitute protected activity."); *Ingrassia v. Health & Hosp. Corp.*,

130 F. Supp. 3d 709, 723 (E.D.N.Y. 2015).  It may also include requests for reasonable

accommodation.  *See Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009);

*Gratton v. Jetblue Airways*, No. 04 Civ. 7561 (DLC), 2005 WL 1251786, at *10

(S.D.N.Y. May 25, 2005) (rejecting argument that request for accommodation of pregnancy did not constitute protected activity).

For a plaintiff's complaint or request to constitute protected activity, the plaintiff is required "to have had a *good faith, reasonable belief* that he was opposing an employment practice made unlawful by Title VII." *Gratton*, 2005 WL 1251786, at *10 (emphasis in original) (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001)); *see also Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).

Farmer argues that the AC alleges two instances of protected activity.  First, the AC alleges that Farmer requested an accommodation when she complained to two managers, Jeffrey #1 and Jeffrey #2, about feeling overheated in the back of the house and asked to be moved to the front.  AC ¶ 49.  Second, the AC alleges that Farmer complained to Leon, one of her managers, that Jeffrey #2 was treating her differently due to her pregnancy.  *Id.* ¶ 52.

Although Farmer's requests are both far from maximally pellucid, construing them in the light most favorable to the plaintiff as is required on a motion to dismiss, the Court holds that (1) Farmer's request to be moved is plausibly pled to have been a request to accommodate conditions caused by her pregnancy, and (2) her complaint to Leon is plausibly pled to have been an informal complaint to a manager about pregnancy discrimination at Shake Shack.  Insofar as Farmer is alleged to have made or authored both requests, the AC fairly pleads that she thereby participated in protected activity.

Defendants fault Farmer's complaints because they did "not indicate how she was being treated differently, whom she was being treated differently than, or why she speculates that any treatment was connected to her pregnancy."  Def. Mem. at 15.  But, for the reasons reviewed above, the AC clearly plausibly alleges that Farmer—whose pregnancy was the basis for various

directives and requests made to her by supervisors—was treated differently, even before her termination, based on her pregnancy. Regardless, to state a claim for retaliation, Farmer need not show that the underlying employment practice actually violated Title VII. *See McMenemy*, 241 F.3d at 285. Instead, to plead protected activity, the AC must allege only that Farmer, in complaining, had a good faith and reasonable belief that she was opposing an unlawful employment practice. *Id.* The AC depicts Farmer's complaints as made in good faith and there is no basis on the pleadings to infer otherwise. It therefore adequately alleges protected activity.

### ii.    Employer's Knowledge

Defendants next argue that the AC fails to allege that Cordova knew of the complaints. *See* Def. Mem. at 15–16. The AC states that three managers were aware of the protected activity: Jeffrey #1, Jeffrey #2, and Leon. *See* AC ¶¶ 49, 52. Although Farmer does not claim (pre-discovery) to know that Cordova was told of the complaints, it is circumstantially plausible to infer that these managers told him, as general manager, about these complaints by a direct report of theirs. *See Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007) (knowledge prong satisfied where plaintiff complained to university employee of defendant's behavior because "it is not inappropriate at this stage in the litigation to assume that in investigating Plaintiff's complaint, [the employee] made [defendant] aware of their existence"). And Cordova's comments about Farmer's declining performance—made on January 1, 2019, soon after the two instances of protected activity—are plausibly alleged to have been prompted by his learning of them. *See* AC ¶ 54. In any event, as the Second Circuit has repeatedly held, "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Patane*, 508 F.3d at 115 (alteration in original) (quoting *Kessler*, 461 F.3d at 210). The AC's allegations thus are sufficient, at this stage, to allege defendants' knowledge. *Cf. Zann*

*Kwan*, 737 F.3d at 844 (complaint to officer sufficient to find defendant corporation had knowledge); *Patane*, 508 F.3d at 115 (complaint to university employee sufficient to find defendant university had knowledge).

### iii.   Causal Connection

Under Title VII, "for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action."[7] *Vega*, 801 F.3d at 90 (citing *Nassar*, 570 U.S. at 360). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action"; instead, it requires only that absent the retaliatory motive, the adverse action would not have occurred. *Duplan*, 888 F.3d at 625 (quoting *Vega*, 801 F.3d at 90–91).

A plaintiff may establish causation either "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or "indirectly, by showing that the protected activity was followed closely by the discriminatory treatment." *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). As to the latter, "the

---

[7] The Second Circuit has not yet conclusively resolved whether the but-for causation standard applies to claims under the NYSHRL, as it does under Title VII. *See Holcomb v. State Univ. of N.Y. at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017); *Kleehammer v. Monroe County*, 583 F. App'x 18, 21 (2d Cir. 2014); *Zann Kwan*, 737 F.3d at 847 n.7. On several occasions, however, the Circuit has implicitly applied the but-for standard to NYSHRL claims. *See Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14–16 (2d Cir. 2018) (affirming grant of summary judgment for defendant on Title VII and NYSHRL retaliation claims where plaintiff failed to raise genuine issue of material fact as to but-for causation); *Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 14 (2d Cir. 2018) (explaining but-for causation where retaliation claim brought only under NYSHRL); *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 7 (2d Cir. 2017) (finding that "the record lack[ed] sufficient support for [plaintiff's] argument under the but-for causation standard of . . . NYSHRL"). District courts in this Circuit—including this one—have also applied the but-for standard to NYSHRL claims. *See, e.g.*, *Smith v. N.Y. & Presbyterian Hosp.*, --- F. Supp. 3d ---, No. 18 Civ. 776 (PAE), 2020 WL 777786, at *21 n.22 (S.D.N.Y. Feb. 18, 2020) (collecting cases). The New York Court of Appeals has not yet resolved this issue of New York law. The doctrinal question is of no moment here: Because the AC pleads sufficient facts to satisfy but-for causation, it necessarily would also satisfy the lower "motivating factor" standard.

but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . .

through temporal proximity." *Vega*, 801 F.3d at 91 (quoting *Zann Kwan*, 737 F.3d at 845).

    The AC is devoid of factual allegations that would qualify as direct evidence, such as "an

admission by the decisionmaker" that he or she made a decision by relying on an improper

consideration, *e.g.*, "I fired him because he was too old." *Tyler v. Bethlehem Steel Corp.*,

958 F.2d 1176, 1185 (2d Cir. 1992).  But retaliatory motivation can be plausibly inferred from

the assembled allegations in the AC, in particular, based on the close temporal proximity of

Farmer's termination relative to her protected activities.  *See Zann Kwan*, 737 F.3d at 845 ("[A]

plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing

that the protected activity was closely followed in time by the adverse [employment] action."

(citation omitted)).  Although the Second Circuit has "not drawn a bright line to define the outer

limits beyond which a temporal relationship is too attenuated to establish a causal

relationship," *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty.*, 252 F.3d 545,

554 (2d Cir. 2001), the Supreme Court has suggested that the temporal proximity "must be very

close," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (internal

quotation marks and citation omitted).

    That standard is met given the close proximity of the relevant events as pled here.  In

mid-December 2018, Farmer made multiple requests to Jeffreys #1 and #2 to be moved.  *See* AC

¶ 49.  In late December, she complained to Leon, after which supervisors treated her worse.  *See*

*id.* ¶ 52.  On January 1, 2019, Cordova questioned Farmer about her work performance and

challenged her claim of pregnancy.  *See id.* ¶¶ 54–59.  And four days later, on January 5, 2019,

Cordova fired Farmer.  *See id.* ¶¶ 63–70.  At most, three weeks separated Farmer's first request

for an accommodation and her firing.  *See Zann Kwan*, 737 F.3d at 845 (three-week period

between complaint and termination sufficient to show causal connection); *see also, e.g.*, *Feliciano v. City of New York*, No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) (collecting cases requiring adverse action to occur within approximately two months of plaintiff's protected activity).  These events plausibly plead a causal connection.

The AC, measured against "the reduced prima facie requirements" applicable at this stage, *Littlejohn*, 795 F.3d at 316, thus plausibly pleads a claim of retaliation.  Discovery will test what the basis in fact was for Farmer's discharge.

### 2.      NYCHRL Claim

The Court's holding sustaining the AC's retaliation claims under Title VII and the NYSHRL dictates the same result under the NYCHRL, whose retaliation standard is similar to— but in part more permissive than—its federal and state analogues.[8]  *See Deveaux*, 2020 WL 1812741, at *6–7 (because plaintiff's retaliation claims met Title VII/NYSHRL standard, they also satisfied the NYCHRL standard).

### E.      Hostile Work Environment

The AC brings hostile work environment claims under Title VII and the NYSHRL, but not the NYCHRL.  *See* AC ¶¶ 93, 98, 106–10.

---

[8] Under the NYCHRL, a plaintiff must allege that "she took an action opposing her employer's discrimination . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  *Tang*, 2015 WL 1344788, at *5 (quoting *Mihalik*, 715 F.3d at 112); *see also* N.Y.C. Admin. Code § 8-107(7).  Unlike the but-for standard used under Title VII and the NYSHRL, the employer is liable "if [he] was motivated *at least in part* by an impermissible motive."  *Id.* (alteration and emphasis in original) (quoting *Brightman v. Prison Health Serv., Inc.*, 970 N.Y.S.2d 789, 792 (2d Dep't 2013)).

### 1.      Applicable Legal Principles

Hostile work environment claims under Title VII and the NYSHRL are judged by the same standard.[9] *Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013).  "To establish a hostile work environment . . . ,  a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Littlejohn*, 795 F.3d at 320 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

The hostile work environment test has both objective and subjective elements.  "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22).  "In determining whether a plaintiff suffered a hostile work environment, [the Court] must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Love v. Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 253 (E.D.N.Y. 2016) (citing *Littlejohn*, 795 F.3d at 321).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

---

[9] In August 2019, the NYSHRL was amended to eliminate the "severe or pervasive" standard for such claims.  *See* Grace O'Donnell & Richard Rabin, *Amendments to State Human Rights Law Will Impact New York Companies*, JD Supra (Aug. 15, 2019), https://www.jdsupra.com/legalnews/amendments-to-state-human-rights-law-23350.  The events in this case, however, preceded that amendment.

The Second Circuit has "cautioned against setting the bar too high" for hostile work environment claims. *Terry*, 336 F.3d at 148. To survive a motion to dismiss, a plaintiff must allege facts showing "she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Patane*, 508 F.3d at 113 (quoting *Terry*, 336 F.3d at 148).

> ### 2.    Application

Defendants do not contest that the AC adequately alleges that Farmer subjectively found her work environment hostile. The AC alleges that, after her interactions with Cordova and other Shake Shack employees, she felt offended, humiliated, and fearful of losing her job. AC ¶¶ 39, 41. Defendants, however, dispute whether the conduct alleged in the AC is objectively sufficiently severe or pervasive to give rise to a hostile work environment claim. *See* Def. Mem. at 12–13. Defendants are correct: It is not.

In support of the hostile work environment claim, Farmer points to these allegations: that (1) Cordova and a regional manager reprimanded her for not telling them about her pregnancy and questioned her, on a few occasions, as to whether she was able to do her job, *see* AC ¶¶ 35, 38–40, 54; (2) a manager commented that she was needed in the back of the house, even after she complained of being overheated, *id*. ¶¶ 49–51; (3) Cordova stated the he did not believe she was pregnant and demanded that she bring documentation on short notice, *id*. ¶¶ 56–60; and (4) Cordova, before firing her, chided her for using the restroom and told her that her pregnancy documentation "meant nothing," *see id*. ¶¶ 63–70. *See* Pl. Mem. at 11.

Defendants counter that this conduct, however regrettable, falls short of an actionable hostile work environment claim. They argue that the conduct here is no more severe than that alleged in *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298 (2d Cir. 2017), in which a work environment hostile to a pregnant woman was also alleged. The

plaintiff there alleged that (1) she had overheard a phone conversation in which defendants stated they "had a right" to disapprove of her pre-marital pregnancy and to disparage her and her attorneys; (2) defendants had removed her name from the synagogue's newsletters and list of employees on a wall; (3) plaintiff's boss insisted that she complete tasks before the date of her termination and transition her responsibilities to other employees; and (4) two of her bosses stopped speaking to her. *See Shultz*, 867 F.3d at 303, 308. The Second Circuit affirmed the dismissal of the hostile work environment claim. *Id.* at 309. It explained that "none of [those incidents] taken in isolation is sufficiently severe, and all of them taken together, over a period of just a few weeks, are not sufficiently pervasive, to raise an issue of fact as to whether she suffered a hostile work environment." *Id.*

Farmer's allegations are no more severe than those alleged in *Shultz*. The AC does not allege that Cordova or any other managers explicitly disparaged her or her pregnancy, or stopped speaking to her. While her conversations with Cordova in which he questioned her capacity to keep up with the job and demanded documentation of her pregnancy were surely uncomfortable, they do not rise to the level of severe as measured by caselaw in this Circuit. *See Gratton*, 2005 WL 1251786, at *9 (dismissing hostile work environment claim where plaintiff alleged that defendants harassed her about obtaining a doctor's note explaining her limitations while pregnant and reprimanded her for complaining to others about her treatment); *cf. Littlejohn*, 795 F.3d at 321 (same where plaintiff alleged that defendant said negative things about her, was impatient

and used harsh tones, stayed away from her, declined to meet with her, wrongfully reprimanded her, increased her reporting schedule, and made sarcastic comments to her).[10]

Farmer distinguishes her case from *Schultz* on the ground that, even if the conduct alleged is no more severe, she was subjected to uncomfortable conduct for a longer period. Pl. Mem. at 10–11. The AC, she states, alleges hostile behavior spanning "a period of months," *id.* at 10, whereas, in *Schultz*, the events lasted only a "few weeks," *Schultz*, 867 F.3d at 309. That is factually wrong. The AC claims that she did not first disclose her pregnancy to any employees until late November 2018 and did not tell Cordova until after Thanksgiving. AC ¶¶ 33–35. She was fired January 5, 2019. *See id.* ¶¶ 63, 70. Accordingly, the time period at issue in the AC covers some four to six weeks, not "a period of months." In all events, the difference in time

---

[10] Courts have granted defense summary judgment motions based on far more severe behavior than alleged here. *See, e.g.*, *Marshall v. N.Y.C. Bd. of Elections*, 322 F. App'x 17, 18–19 (2d Cir. 2009) (finding no hostile work environment where homosexual supervisor showed plaintiff a "sexual device he had purchased for his partner," even though plaintiff "may have been legitimately offended" by such talk; had a violent temper; "stood over her with clenched fists on several occasions"; disparaged her education; and engaged in "crass behavior"); *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 278–79 (S.D.N.Y. 2007) (finding male-to-male statements in the workplace such as "you're such a bitch," "good morning ladies," "when are you going to come out of the closet," and "are you ladies going to the parade?" insufficient to defeat summary judgment on hostile work environment claim); *Mack v. Port Auth. of N.Y. & N.J.*, 225 F. Supp. 2d 376, 388–89 (S.D.N.Y. 2002) (finding allegations that supervisor called African American plaintiff a "boy," made petty criticisms of non-white workers, gave disparate work assignments, and engaged in disparate enforcement of lunch and break limitations inadequate for race-based hostile work environment claim); *Dayes v. Pace Univ.*, No. 98 Civ. 3675 (WHP), 2000 WL 307382, at *1, 4–5 (S.D.N.Y. Mar. 24, 2000), *aff'd*, 2 F. App'x 204 (2d Cir. 2001) (finding no hostile work environment where plaintiff was subjected to six sexual comments and multiple requests for dates, shouted at by a supervisor, and touched on the back); *Lucas v. S. Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141, 147–49 (E.D.N.Y. 1998) (denying NYSHRL hostile work environment claim where supervisor brushed against plaintiff three times, touched plaintiff three times, briefly touched plaintiff's back or shoulders five to seven other times, asked about the color of plaintiff's underwear, said plaintiff wanted to "go to bed" with her, and said "fuck you" to plaintiff on two occasions); *Ricard v. Kraft Gen. Foods, Inc.*, No. 92 Civ. 2256 (GLG), 1993 WL 385129, at *3 (S.D.N.Y. Mar. 16, 1993), *aff'd*, 17 F.3d 1426 (2d Cir. 1994) (finding four sexually-oriented incidents insufficient to withstand summary judgment).

span between this case and *Schultz* is negligible at best.  The conduct alleged here, simply put, is

not sufficiently "continuous and concerted in order to be deemed pervasive."  *Terry*, 336 F.3d

at 148

The Court therefore dismisses the AC's hostile work environment claims under Title VII

and the NYSHRL.

### F.     Aiding and Abetting Claims

The AC brings aiding and abetting claims under the NYSHRL and the NYCHRL against

Cordova individually.  The AC is hazy as to the wrongs it claims Cordova aided and abetted.

The Court construes the AC to bring such claims as to the alleged sex and race discrimination

and retaliation claims.  *See* AC ¶¶ 103, 113.

"[U]nder both Exec[.] Law § 296(6) and NYC Admin. Code § 8–107(6), an individual

employee may be held liable for aiding and abetting discriminatory conduct."  *Krause v. Lancer*

*& Loader Grp.*, 965 N.Y.S.2d 312, 323 (Sup. Ct., N.Y. Cty. 2013).  "The language of both [the]

NYSHRL and [the] NYCHRL is identical, providing that 'it shall be an unlawful discriminatory

practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts

forbidden under this article, or attempt to do so.'"  *Id.* at 323 n.7 (quoting N.Y. Exec. Law

§ 296(6); N.Y.C. Admin Code § 8-107(6)).  Thus, "the Administrative Code . . . is subject to the

same analysis as the Executive Law."  *Dunson v. Tri-Maint. & Contractors, Inc.*,

171 F. Supp. 2d 103, 113 (E.D.N.Y. 2001); *see also Feingold*, 366 F.3d at 158.

To make out an aiding and abetting claim, the pleadings must allege that "[defendant]

'actually participate[d] in the conduct giving rise to a discrimination claim.'"  *Xiang*,

2020 WL 248941, at *5 (quoting *Feingold*, 366 F.3d at 158).  The Second Circuit has held that

"a co-worker who actually participates in the conduct giving rise to a discrimination claim [can]

be held liable under the NYSHRL [or NYCHRL] even though that co-worker lacked the

authority to either hire or fire the plaintiff." *Feingold*, 366 F.3d at 158 (internal quotation marks and citation omitted). "This extends to personal liability 'for aiding and abetting allegedly unlawful discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability,' so long as the employer's conduct has also been found to be discriminatory under the NYSHRL." *Xiang*, 2020 WL 248941, at *5 (alteration in original) (quoting *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012)); *see also, e.g.*, *Ulrich v. Soft Drink, Brewery Workers & Delivery Emps.*, 425 F. Supp. 3d 234, 244 n.10 (S.D.N.Y. 2019) (recognizing that *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), which announced the above principle, creates "a strange and confusing circularity," but stating that the law of the Circuit "seems clear" (citation omitted)); *Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008) ("The Court is mindful that the *Tomka* interpretation of § 296(6) is not without controversy. Nevertheless, until the Second Circuit revisits the issue, *Tomka* is the law in this Circuit." (internal quotation marks and citation omitted)).

That standard is met here. As to the surviving claims for sex discrimination and retaliation, the AC "is replete with allegations that [Cordova] 'actually participated' in the alleged unlawful conduct[.]" *Tully-Boone*, 588 F. Supp. 2d at 427. Although Cordova cannot aid or abet his own conduct, *see Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367 & n.7 (S.D.N.Y. 2012), the AC has sufficiently alleged that the Shake Shack Defendants acted unlawfully, on the basis of a combination of his conduct and others. Cordova, an employee of the Shake Shack Defendants, is therefore plausibly pled, under *Tomka*, to have aided and abetted the Shake Shack Defendants in these violations of law. To be sure, Cordova's actions are the main factual basis for the Shake Shack Defendants' alleged liability, but the law

does not prohibit him from being held liable as an aider and abetter of his employer. *See, e.g.*, *Tully-Boone*, 588 F. Supp. 2d at 427 (declining to dismiss aiding and abetting claim where individual defendant's actions were predicate for employer's vicarious liability). The Court therefore denies defendants' motion to dismiss the NYSHRL and NYCHRL aiding and abetting claims against Cordova with respect to sex discrimination and retaliation. However, because the AC does not state a claim for race discrimination or a hostile work environment on the part of any defendant, there is no predicate for aiding and abetting liability with respect to these claims. *Conklin*, 859 F. Supp. 2d at 436.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion in part and denies it in part. The Court denies the motion to dismiss Farmer's sex discrimination and retaliation claims, and the claim that Cordova aided and abetted these violations of law, but grants the motion as to all other claims.

The Court will, by separate order, schedule an initial pretrial conference. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 13 and 20.

SO ORDERED.

*Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 21, 2020
       New York, New York